OPINION OF THE COURT
FUENTES, Circuit Judge,
with whom AMBRO, Circuit Judge, joins as to Parts II.A.2, II.B, and II.C, and GREENBERG, Circuit Judge, joins as to Part II.A.
Hanover 3201 Realty, LLC (“Hanover Realty”) signed a contract with Wegmans to develop a supermarket on its property in Hanover, New Jersey. The agreement required Hanover Realty to secure all necessary governmental permits and approvals prior to breaking ground. Village Supermarkets, Inc. (“ShopRite”) owns the local ShopRite. Once ShopRite and its subsidiary Hanover and Horsehill Development LLC (“H & H Development”) (collectively, “Defendants”) caught wind that Wegmans might be entering the market, they filed numerous administrative and court challenges to Hanover Realty’s permit applications. Believing these filings were baseless and intended only to frustrate the entry of a competitor, Hanover Realty sued Defendants for antitrust violations. Hanover Realty alleged that Defendants attempted to restrain the market for full-service supermarkets as well as the market for full-service supermarket rental space. The District Court dismissed the suit, holding that Hanover Realty did not have antitrast standing because it was the wrong plaintiff — it was not a competitor, consumer, or participant in the restrained markets and thus did not sustain the type of injury the antitrust laws were intended to prevent.[1]
We conclude that, with respect to the claim for attempted monopolization of the market for full-service supermarkets, the District Court took too narrow a view of antitrust injury. Hanover Realty can establish that its injury was “inextricably *167 intertwined” with Defendants’ anticompeti-tive conduct. However, as to the claim for attempted monopolization of the market for rental space, the District Court correctly found no standing because Hanover Realty does not compete with Defendants in that market. We also hold that Hanover Realty has sufficiently alleged that the petitioning activity here was undertaken without regard to the merits of the claims and for the purpose of using the governmental process to restrain trade. As such, Hanover Realty can demonstrate that Defendants are not protected by Noerr-Pen-nington immunity because their conduct falls within the exception for sham litigation. Accordingly, we will affirm in part, vacate in part, and remand to the District Court for further proceedings.
1. BACKGROUND
Plaintiff Hanover Realty is a real estate developer and the owner of a plot of land in Hanover, New Jersey.[2] In July 2012, Hanover Realty entered into a lease and site-development agreement with Weg-mans for the purpose of constructing a “full-service supermarket.” App. 66. These types of supermarkets, in contrast to their local ’grocery store counterparts, provide customers with a “one-stop shopping” experience. App. 67. Full-service supermarkets supply not only traditional groceries, but also additional amenities, including prepared foods to go, on-site dining options, wine and liquor, specialty products, and other services such as pharmacies, banks, and fitness centers. The site-development agreement placed the burden on Hanover Realty to obtain all necessary governmental permits prior to beginning construction. If Hanover Realty was unable to secure the required permits within two years of the agreement, Wegmans could walk away from the deal.
Defendant ShopRite is the proprietor of 26 ShopRite supermarkets in New Jersey, including a ShopRite in Hanover that is about two miles away from the site of the proposed Wegmans. The ShopRite opened in November 2013 and replaced the previous one in Morris Plains,-which has since closed. Defendant H & H Development, a wholly-owned subsidiary of ShopRite, owns the property on which the Hanover ShopRite sits, and leases the land or building to ShopRite. ShopRite and H & H Development have the same decision makers. Hanover Realty alleges that the ShopRite in Hanover is the only full-service supermarket operating in the greater Morristown area.
Once news broke that Wegmans was coming to town, Defendants launched a petitioning campaign designed to block Hanover Realty from obtaining the permits and approvals it needed to proceed with the project. We describe these filings here.
First, Hanover Realty applied for a Flood Hazard Area Permit (“Flood Permit”) from the New Jersey Department of Environmental Protection (“Environmental Department”). After Hanover Realty received the permit, ShopRite (on behalf of itself and H & H Development) submitted an appeal to the Environmental Department requesting an adjudicatory hearing and seeking an order that would vacate the permit. Defendants asserted that they had standing to bring the appeal because the then-existing ShopRite in Morris Plains would be “detrimentally impacted” by the competition from the Wegmans. App. 74. Over the next five months, De *168 fendants submitted additional documents to the Environmental Department, including an objection that Hanover Realty failed to comply with relevant notice requirements and an amended request for an adjudicatory hearing.
About a month after Hanover Realty filed its amended complaint in this action, the Environmental Department issued an order denying Defendants’ request for a hearing. It first found that ShopRite had no standing, explaining that “[cjourts have consistently held that proximity or any type of generalized property right shared with other property owners such as recreational interests, traffic, views, quality of life, and property values are insufficient to demonstrate a particularized property right required to establish third party standing for a hearing.” App. 157. Sho-pRite’s “generalized property rights” and its claim of “greater competition” from the proposed Wegmans were not enough to show that it was an aggrieved party. The Environmental Department also evaluated the substance of Defendants’ arguments and found them without merit.
Second, Hanover Realty submitted a multi-permit application to the Environmental Department seeking various wetlands approvals (“Wetlands Permit”) for the Wegmans project. An ecological consulting firm sent a letter to the Environmental Department on behalf of Defendants raising various challenges to this permit. One objection was that Hanover Realty’s notice to neighboring landowners was “technically deficient.” App. 77. In response to this objection, and as “required” by the Environmental Department, Hanover Realty corrected this “administrative error” the next week and submitted a revised application. App. 169. The ecological consultant also voiced its concern that the site of the proposed Wegmans was a potentially suitable habitat for certain endangered species, including the Indiana bat.[3] A few days later, Defendants submitted another letter to the Environmental Department, this time requesting a meeting to discuss the Wetlands Permit and “strongly urg[ing]” it to “diligently and prudently” review the permit and not act with “haste” in granting approval. App. 78. In the following months, Defendants’ ecological consultant complained to the United States Fish and Wildlife Service about the Wetlands Permit. In one email to the Wildlife Service, the consulting firm praised itself for “managing] to delay the issuance of the [Wetlands] approvals based on a technicality” and said that its substantive objections “may delay things a bit longer.” App. 80. Hanover Realty responded to Defendants’ multifaceted challenge with its own submissions, explaining why, in its view, each objection was unsubstantiated: Moreover, Hanover Realty alleges that Defendants knew the wetlands at issue are not federally regulated waters, but nonetheless contacted the Wildlife Service to add friction to the review process.
The Environmental Department issued Hanover Realty its requested Wetlands Permit, subject to various conditions. One such condition required Hanover Realty to conduct a survey for the presence of Indiana bats prior to construction.[4] After the Environmental Department issued the *169 permit, Defendants submitted a request for an adjudicatory hearing to challenge the approval.[5]
Third, the tract of land owned by Hanover Realty has been the subject of several contracts and sales over the years, including a four-phased developer’s agreement with the New Jersey Department of Transportation that dates back, to 1978. Under that agreement, the owner of the land must make certain road improvements as it reaches various phases of development. Hanover Realty believed the Wegmans project would trigger Phase III of the agreement. Consistent' with that understanding, Hanover Realty submitted an application for a Major Street Intersection Permit (“Street Permit”) to the Department of Transportation in which it proposed improvements to a nearby intersection in connection with the Wegmans project. Defendants submitted a letter objecting to the application, and then proceeded to file a number of open public records requests seeking additional information upon which they could contest the application. Defendants then sent another letter to the Department of Transportation informing it that the Wegmans project would trigger Phase TV of the developer’s agreement. As a result, Defendants said, Hanover Realty was required to build an overpass over a nearby highway before it could proceed any further. Hanover Realty and its traffic engineering consultant submitted letters of their own, explaining that the Phase IV requirements (including the overpass) were not implicated by the Wegmans project. Hanover Realty alleges that Defendants knew the Phase IV obligations were not triggered because their counsel had negotiated the developer’s agreement.
The Department of Transportation issued a letter responding to the parties’ various submissions relating to the Street Permit application. The letter began by acknowledging that the Department of Transportation is “required to consider any relevant data, analysis, and arguments submitted by third parties.” App. 165. It then agreed with Defendants that the proposed development would generate traffic at certain hours that would exceed the level of traffic contemplated by Phases I, II, and III of the developer’s agreement. Moreover, although it did not specifically mention the overpass or whether Phase IV obligations would be implicated, the Department of Transportation said the Weg-mans project “would trigger the need for additional highway improvements as stipulated in the [developer’s] agreement.” App. 167. It noted, however, that the “improvements may no longer be appropriate or feasible” and therefore recommended that Hanover Realty negotiate a modification to the agreement with the Department of Transportation. App. 167.[6]
Fourth, in mid-2012, Hanover Realty applied to the Hanover Township Committee to rezone the property of the proposed Wegmans so that it could be used for retail space. The next summer, Hanover Realty received approval of its final site plan and request for a bulk variance. Defendants did not lodge any objections during that year-long process. Instead, in August 2013, ShopRite (on behalf of itself and H & H Development) filed an action in lieu of prerogative writs in New Jersey state court seeking to nullify the approval. *170 Over the next several months, Defendants filed three amended complaints, which Hanover Realty alleges were filed for the purpose of delay.
In June 2014, after Hanover Realty had filed its amended complaint in the present litigation, the Superior Court of New Jersey issued an order dismissing the prerogative writs action. The court found that ShopRite was not an “interested party” because it failed to allege facts suggesting its “right to use, acquire, or enjoy either of its nearby properties” would be affected by the approval of Hanover Realty’s site plan. App. 136. In addition, the court rejected ShopRite’s argument that it had standing based on its status as a local taxpayer. After ruling against ShopRite on the standing issue, the court also addressed and disposed of ShopRite’s arguments on the merits.
Frustrated by Defendants’ many legal challenges, Hanover Realty sued Defendants in federal court. In its amended complaint, Hanover Realty alleges that Defendants’ administrative objections and state-court suit were mere anticompetitive shams designed to keep Wegmans out of the market. Specifically, it asserts claims under Section 2 of the Sherman Act for attempted monopolization of and conspiracy to monopolize the greater Morristown full-service supermarket market (Count One) and the greater Morristown full-service supermarket shopping center market, which it describes as the market for supermarket rental space (Count Two). The amended complaint also contains five-state law claims.
Defendants moved to dismiss the complaint for four independent reasons. The District Court found the threshold issue of antitrust standing dispositive and dismissed the complaint on that ground. It observed that, as a general matter, plaintiffs in antitrust suits must be either consumers or competitors of the defendant in the restrained market — here, the markets for supermarkets and supermarket rental space. Hanover Realty was neither a consumer nor competitor of Defendants in either market. The District Court acknowledged the limited exception to the consumer/competitor requirement for persons whose injuries are “inextricably intertwined” with the harm caused by defendants. But it found Hanover Realty did not fit within that narrow exception either. As a result, Hanover Realty had suffered no antitrust injury and thus had no antitrust standing to pursue its Sherman Act claims.[7] Without a federal claim in play, the District Court declined to exercise supplemental jurisdiction over the state-law claims. Hanover Realty appealed.[8]
II. DISCUSSION
Defendants raise four arguments in support of the District Court’s order: (1) Hanover Realty does not have antitrust stand-' ing; (2) Defendants’ petitioning activity was protected by the Noerr-Pennington doctrine; (3) Hanover Realty has not sufficiently alleged that there is a dangerous probability of Defendants achieving mo *171 nopoly power; and (4) Hanover Realty has failed to plead a specific intent to monopolize.
A. Antitrust Standing
We begin with antitrust standing. Section 2 of the Sherman Act prohibits any attempt to monopolize. 15 U.S.C. § 2. Section 4 of the Clayton Act, in turn, defines the class of persons who may bring a private antitrust suit as “any person” who is injured “by reason of anything” prohibited by the antitrust laws. Id. § 15(a). This extraordinarily broad language reflects the Clayton Act’s remedial purpose and Congress’s intent to “create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations.” Blue Shield of Va. v. McCready, 457 U.S. 465, 472, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Emphasizing § 4’s expansive reach, the Supreme Court has explained that the “statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.” Id. (quoting Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)).
Although a literal reading of § 4’s grant of authority to sue arguably is limited only by the minimal requirements of constitutional standing, the Supreme Court has interpreted this provision more restrictively than that. See Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (“Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.”). Thus, even when there is a clear violation of the antitrust laws, § 4 allows only a “proper plaintiff’ to bring a private suit to remedy that violation. See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 544, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In other words, only certain plaintiffs have “antitrust standing.” Id. at 535 n. 31, 103 S.Ct. 897. In describing how to undertake the antitrust standing inquiry, the Supreme Court has warned that, because of the “infinite variety of claims” that may arise under § 4, a “black-letter rule” cannot dictate the result in every case. Id. at 536, 103 S.Ct. 897. Instead, the Court has articulated several guideposts. See id. at 536-57, 103 S.Ct. 897. We have distilled these antitrust standing factors as follows:
(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiffs alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for du-plicative recovery or complex apportionment of damages.
In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1165-66 (3d Cir.1993) (citing Associated Gen., 459 U.S. at 545, 103 S.Ct. 897). Although we weigh these factors together on a case-by-case basis, the second factor, antitrust injury, “is a necessary but insufficient condition of antitrust standing.” Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 182 (3d Cir.1997).
*172 Antitrust injury has proven difficult to define and apply. The Supreme Court has described it as “injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants’ acts unlawful.” Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In evaluating the nature of a plaintiffs injury, the Supreme Court instructs us to keep in mind that “the Sherman Act was enacted to assure customers the benefits of price competition” and “protect[ ] the economic freedom of participants in the relevant market.” Associated Gen., 459 U.S. at 538, 103 S.Ct. 897. Based on these principles, we have said that, “[a]s a general matter, the class of plaintiffs capable of Satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market ... and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends.” W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 102 (3d Cir.2010) (citing eases). As Hanover Realty offers distinct theories of injury for each of its attempted monopolization claims — one for the market for full-service supermarkets (Count One) and another for the market for full-service supermarket rental space (Count Two) — we discuss these claims separately.
1. Full-Service Supermarkets
Hanover Realty admits it is neither a competitor nor a consumer in the market for full-service supermarkets; it is a land owner and lessor of property, not a food retailer. It instead argues that its injuries were “inextricably intertwined” with Defendants’ attempt to monopolize that market.
The Supreme Court first recognized this form of antitrust injury in McCready. McCready was an employee covered by a group health plan purchased from the defendant Blue Shield. McCready, 457 U.S. at 468, 102 S.Ct. 2540. Under the plan, Blue Shield agreed to reimburse subscribers such as McCready for services provided by psychiatrists, but not by psychologists. McCready was treated by a psychologist and sought reimbursement for her bills, but Blue Shield denied payment. She then filed suit against Blue Shield and a psychiatric society alleging that the two had engaged in an unlawful antitrust conspiracy to exclude psychologists from receiving payment under the Blue Shield plan. Id. at 469, 102 S.Ct. 2540. The defendants argued that McCready had not suffered antitrust injury, because the alleged conspiracy was directed at psychologists and not at subscribers of group health plans. Id. at 478, 102 S.Ct. 2540. The Supreme Court rejected the defendants’ view of antitrust standing, explaining that the § 4 “remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market.” Id. at 479, 102 S.Ct. 2540. Although McCready was not a competitor of the defendants, “the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market.” Id. at 483-84, 102 S.Ct. 2540 (emphasis added). And while McCready was a consumer in the market for psychotherapy services, the Supreme Court’s explanation of why she suffered antitrust injury emphasized not her status as a market participant, but rather that she was directly targeted for harm by parties ultimately wishing to inflict a derivative harm on a competitor. As the Court noted, “[djenying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends.” Id. at 479, 102 *173 S.Ct. 2540. The harm to subscribers like McCready was not only clearly foreseeable, “it was a necessary step in effecting the ends of the alleged illegal conspiracy.” Id.
Underscoring that its reasoning was not limited to consumers, the Court offered the following hypothetical to crystalize the nature of McCready’s injury: “If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists’ actions.” Id. at 484 n. 21, 102 S.Ct. 2540. McCready and the bank “are in many respects similarly situated,” the Court explained, even though the bank is not a customer or consumer in the psychotherapy market. See id. Both were used as conduits to harm the defendants’ actual competitors. Because imposing harm on McCready was an indispensable aspect of the scheme, the Court concluded that the injury to McCready “reflect[ed] Congress’ core concerns” in prohibiting the defendants’ conduct. Id. at 481, 102 S.Ct. 2540.
In contrast to McCready, where the alleged harm to the plaintiff was the primary means of the defendants’ anticompet-itive conduct, harm that is secondary to the anticompetitive conduct cannot support antitrust injury. For example, we have said that, “[although a supplier may lose business when competition is restrained in the downstream market in which it sells goods and services, such losses are merely byproducts of the anticompetitive effects of the restraint,” and do not qualify as antitrust injury. W. Penn Allegheny, 627 F.3d at 102. To illustrate, in Ethypharm S.A. France v. Abbott Laboratories, 707 F.3d 223, 225-26 (3d Cir.2013), a foreign drug manufacturer, Ethypharm, used a domestic distributor to sell one of its drugs in the United States market. After Abbott, the distributor of another drug, sued the domestic distributor for patent infringement, Ethypharm sued Abbott for antitrust violations. We rejected the notion that Ethypharm’s injury was inextricably intertwined with the allegéd scheme. See id. at 237. To effectuate its conspiracy, Abbott needed only to place restrictions on Ethypharm’s domestic distributor and thus any harm suffered by Ethypharm was incidental, rather than essential, to the restraint on trade. See id. at 233. Similarly, in Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297, 319-20 (3d Cir.2007), the plaintiffs asserted basis for antitrust standing was that the defendant’s restraint in one market injured it by suppressing the demand of participants in the restrained market for the plaintiffs supply of goods in another market. As in Ethyp-harm, we said the alleged injury was not inextricably intertwined with the anticom-petitive scheme because it crossed markets and was attenuated from the anticompeti-tive conduct. See id. at 320-21. Together, Ethypharm and Broadcom support the proposition that suppliers and other non-market participants generally do not have antitrust standing unless their injuries were the very means by which the defendants carried out their illegal ends. As we said in West Penn Allegheny, “[a]s a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market ... and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends.” 627 F.3d at 102 (emphasis added).
Because Hanover Realty alleges that its harm was the essential component of Defendants’ anticompetitive scheme as opposed to an ancillary byproduct of it, we conclude that Hanover Realty has sufficiently pleaded antitrust injury under *174 McCready. The ultimate objective of the defendants in McCready was to injure psychologists, not plan subscribers. To achieve that goal, they refused to reimburse subscribers for visits to psychologists, thereby encouraging subscribers to visit psychiatrists. Without injuring those subscribers, there was no conspiracy. Likewise, McCready’s hypothetical bank, which was neither a consumer nor competitor in the psychotherapy market, sustained actionable injury because it was directly harmed as the means of injuring psychologists.
Similar reasoning applies here. The end goal of Defendants’ alleged anticompetitive conduct was to injure Wegmans, a prospective competitor. To keep Wegmans out of the market, Defendants sought to impose costs not on their competitor, but on Hanover Realty, the party tasked with obtaining the necessary permits before construction could begin. Absent this relationship between Hanover Realty and Wegmans, Defendants’ conduct “would have been without purpose or effect.” Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 928 (3d Cir.1999). And Defendants would succeed in their scheme either by inflicting such high costs on Hanover Realty that it was forced to abandon the project or by delaying the project long enough so that Wegmans would back out of the agreement. In both scenarios, injuring Hanover Realty was the very means by which Defendants could get to Wegmans; Hanover Realty’s injury was necessary to Defendants’ plan.
Had Wegmans purchased the property from Hanover Realty and itself applied for the permits, the costs imposed by Defendants’ challenges would have qualified as antitrust injuries. It should make no difference that the parties’ lease shifted these costs to Hanover Realty. See McCready, 457 U.S. at 479, 102 S.Ct. 2540 (observing that antitrust injury “cannot reasonably be restricted to those competitors whom [defendants] hoped to eliminate from the market”). Regardless of who bore these costs, Defendants’ objective remained the same: to keep Wegmans out of -the relevant market.
Defendants seize on language from our precedent saying “we have not extended the ‘inextricably intertwined exception beyond cases in which both plaintiffs and defendants are in the business of selling goods or services in the same relevant market,’ though they may not directly compete against each other.” See Ethypharm, 707 F.3d at 237 (quoting Broadcom, 501 F.3d at 320-21). According to Defendants, because Hanover Realty and Sho-pRite do not operate in the same market, “Hanover Realty cannot establish antitrust injury unless the Court were to break with Ethypharm and Broadcom and greatly expand the scope of the ‘inextricably intertwined’ exception — an expansion that would swallow the rule.” Appellees’ Br. at 19.
Defendants read too much into these statements.[9] As an initial matter, just be *175 cause we have not extended the exception beyond parties that sell goods or services in the same market by no means suggests we shouldn’t (or can’t) do so. In fact, McCready suggests the opposite conclusion. McCready did not sell goods or services in the psychotherapy market — she was a subscriber to a health insurance plan. Nor was the hypothetical bank in McCready even a participant in the psychotherapy market. Nonetheless, both sustained harm that was inextricably intertwined with the defendants’ misconduct. Because § 4 “does not confíne its protection to consumers, or to purchasers, or to competitors, or to sellers” we must avoid placing artificial limits on who may bring suit under the antitrust laws. McCready, 457 U.S. at 472, 102 S.Ct. 2540 (citations omitted). Moreover, our comments in Ethypharm and Broadcom must be read in context. As we discussed, the alleged injuries to the plaintiffs in those cases were byproducts of anticompetitive restraints in separate markets. In contrast, although Hanover Realty and ShopRite operate in separate markets, the very essence of Defendants’ scheme was to impose expense and delay on Hanover Realty as a means of keeping Wegmans out of the relevant market.
Defendants’ final line of defense against a finding of antitrust injury rests on cases from other jurisdictions. In an industry notorious for low profit margins, perhaps it is not surprising that this is just the latest in a series of cases in which a supermarket allegedly employed anticompetitive tactics to keep a competitor out of the market.[10] Defendants rely mostly on the Sixth Circuit’s decision in Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079.
Southaven was an owner-lessor of commercial space and Malone operated a number of grocery stores in the neighborhood. Southaven, 715 F.2d at 1080. Malone assumed a lease to premises owned by Sou-thaven, but the parties later agreed to cancel the agreement. However, upon learning that Southaven intended to find a grocery store to fill the vacancy, Malone refused to cancel the contract. Malone continued to pay rent on the vacant lot and did not otherwise breach any of its contractual obligations. Id. at 1087. Southa-ven nonetheless sued for antitrust violations, alleging that Malone intended to leave the space vacant so as to destroy competition for its other grocery stores. The Sixth Circuit rejected Southaven’s argument that its injury was inextricably intertwined with the injury Malone sought to inflict on the grocery market. Id. at 1086-87. It explained that “Southaven [a real estate lessor] is not alleged to be a member of a class of ‘consumers’ of grocery products or a class otherwise manipulated or utilized by Malone as a fulcrum, conduit or market force to injure competitors or participants” in the relevant market. Id. at 1086. Rather, Southaven’s injury was, at most, a “tangential by-product” of the alleged monopolistic conduct. Id. at 1086-87.
We do not find Southaven persuasive here because it addressed a different set of facts and a different kind of injury. Sou- *176 thaven’s only economic harm was the vague allegation that Malone was “subvert[ing] [its] business and financial interests.” Id. at 1087. This supposed subversion of business interests was not the means by which Malone was trying to achieve its illegal ends; it was an incidental effect in the real estate rental market rather than the grocery market. Indeed, by continuing to pay rent and honoring its contractual obligations, Malone arguably did not intend to harm Southaven at all. As in Ethypharm and Broadcom, the alleged downstream harm was too attenuated to support antitrust injury. In fact, Southaven supports the view that there was antitrust injury here, for Hanover Realty was used as the “fulcrum, conduit or market force” that was missing in Southa-ven. Forcing Hanover Realty to pay thousands of dollars in legal fees to defend itself against alleged anticompetitive filings and imposing significant delays on the project were the very means by which Defen-, dants sought to keep a competitor out of the market.[11] For all these reasons, we conclude that Hanover Realty has sufficiently alleged antitrust injury in the market for full-service supermarkets because its injury was inextricably intertwined with Defendants’ monopolistic conduct.
In his dissent in part, Judge Ambro says that, in his view, a “plaintiff has not suffered antitrust injury unless its own harm stems from the anticompetitive consequences of the defendant’s conduct.” Judge Ambro Op. at 185. According to Judge Ambro, the plaintiffs injury in McCready was actionable because she was a consumer in the psychotherapy market and Blue Shield “used a classic antitrust harm — -increased prices — as a fulcrum to distort” that market. Id. at 4. Judge Am-bro believes that McCready was “injured because of the anticompetitive effects” of Blue Shield’s conduct, but that Hanover Realty did not sustain a similar type of injury. Id. In our view, Judge Ambro’s analysis resembles that espoused by then-Justice Rehnquist in his dissent in McCready. Justice Rehnquist said that McCready could not recover under the antitrust laws because she “alleges no anti-competitive effect upon herself’ — her harm did not arise from an increase in price, decrease in availability of services, or reduction in competition. McCready, 457 U.S. at 489, 102 S.Ct. 2540 (Rehnquist, J., dissenting).
The majority agreed that McCready did not suffer one of these traditional forms of antitrust harm, but that did not foreclose relief. See id. at 482-83, 102 S.Ct. 2540. She suffered antitrust injury because the harm imposed on her — denying reimbursement for visits to her psychologist — was the very means by which Blue Shield sought to harm psychologists. Similarly, Hanover Realty does not allege a classic antitrust harm, but it nonetheless sufficiently alleges antitrust injury because its harm was the very means by which Defendants sought to keep Wegmans out of the market. Indeed, Hanover Realty was the immediate target and bore the costs of Defendants’ scheme.
Moving to the other four factors of the antitrust standing analysis, we first find that Hanover Realty sufficiently alleges a causal connection between the antitrust violation and its harm. Defendants’ alleged sham petitioning caused Hanover *177 Realty to pay thousands of dollars in attorney’s fees and costs in filing its responses.
The next two factors are interrelated and go to the directness of the injury and the existence of more direct victims of the antitrust violations. These both favor Hanover Realty as well. Under McCready, a plaintiff can suffer direct injury even if the defendant’s anticompeti-tive conduct ultimately targets a third party; although the defendants there sought to harm competing psychologists and not the plaintiff health plan subscriber, the Supreme Court declared that the denial of reimbursement for those receiving treatment from psychologists injured the plaintiff “directly.” 457 U.S. at 483, 102 S.Ct. 2540. Likewise, Defendants’ legal challenges directly injured Hanover Realty. If Defendants’ attempt to prevent Wegmans from leasing the property fails, then Hanover Realty will have suffered the costs of responding to the legal challenges while Wegmans may have experienced no loss at all. In addition, to the extent Defendants succeed in obstructing the lease, Hanover Realty’s loss of rent under the contract would result directly and not through “several somewhat vaguely defined links.” Associated Gen., 459 U.S. at 540, 103 S.Ct. 897. That Wegmans is another possible direct victim “does not diminish the directness of [Hanover Realty’s] injury.” Lower Lake Erie, 998 F.2d at 1168-69.
The final factor, the potential for dupli-cative recovery or complex apportionment of damages, also supports standing. Hanover Realty’s recovery of the costs of responding to the legal challenges would not pose a risk “of overlapping damages as no other [party has] suffered this distinct type of injury.” Id. at 1164 n. 11. Furthermore, any damages awarded for the delay or obstruction of the lease would not yield duplicative recovery as the lost rent to Hanover Realty would have to be subtracted as a cost from any subsequent claim by Wegmans for lost profits. See id. at 1169 n. 22. Although this last scenario would require some apportionment of damages, the calculation would not be complex.
Accordingly, Hanover Realty has adequately alleged antitrust standing on its claim for attempted monopolization of the market for full-service supermarkets.
2. Full-Service Supermarket Shopping Centers
Hanover Realty does not rely on the “inextricably intertwined” doctrine for its attempted monopolization claim concerning the market for full-service supermarket shopping centers. Instead, Hanover Realty argues that it directly competes in this market for rental space with H & H Development, which owns the land on which the ShopRite resides.
Antitrust injury ordinarily is limited to consumers and competitors in the restrained market. See Ethypharm, 707 F.3d at 233. If doubts arise as to whether the parties are competitors, we look to see whether “there is a cross-elasticity of demand between the plaintiffs’ offering and the defendants’ offering.” Carpet Grp., 227 F.3d at 77. Such cross-elasticity exists where customers of the defendant would switch to the plaintiff if the defendant raised its prices. Id. at 77 n. 13.
Hanover Realty argues that both it and H & H Development compete in the marketplace for supermarket rental space because they “both operate an enterprise in it.” Appellant’s Br. at 44. We are not persuaded. According to Hanover Realty, H & H Development is a wholly-owned subsidiary of ShopRite; the two have the same decision makers; H & H Development owns no property other than the land on which the ShopRite sits; and H & H Development leases that property to its *178 parent. Hanover Realty fails to explain how it competes with H & H Development as a supermarket landlord in any meaningful way. For example, it does not argue there is any cross-elasticity between Hanover Realty’s and H & H Development’s offerings. If a traditional supermarket landlord raised rent to an excessive level, then the supermarket presumably would move its business to another property, such as Hanover Realty’s. But why would H & H Development raise ShopRite’s rent given that they have the same decision makers? As H & H Development’s sole purpose is to own the ShopRite property, Hanover Realty never alleges that H & H Development is competing for any tenants other than its parent — to the extent one can even call that “competing.” Because Hanover Realty cannot establish antitrust injury in the market for full-service supermarket shopping centers, it has no standing to bring its attempted monopolization claim of this market. Therefore, we affirm the dismissal of Count Two of the amended complaint.
B. Noerr-Pennington
Having survived (in part) the threshold issue of antitrust standing, we proceed to Hanover Realty’s next major obstacle: Noerr-Pennington immunity.[12] The Noerr-Pennington doctrine-takes its name from a pair of Supreme Court cases that placed a First Amendment limitation on the reach of the Sherman Act. See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523; 5 L.Ed.2d 464 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Noerr-Pennington provides broad immunity from liability to those who petition the government, including administrative agencies and courts, for redress of their grievances. Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Although Noerr-Pennington is a powerful shield, it is not absolute. Noerr itself recognized “[t]here may be situations” in which a petition “is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.” Noerr, 365 U.S. at 144, 81 S.Ct. 523. And so spawned the “sham” exception.
Two Supreme Court cases have explored the contours of this exception. In California Motor, the respondents, a group of highway carriers, alleged that the petitioners, another group of highway carriers, engaged in anticompetitive conduct by instituting state and federal proceedings to defeat the respondents’ applications for operating rights. 404 U.S. at 509, 92 S.Ct. 609. The Court held that the complaint demonstrated a sham because it contained allegations that respondents “sought to bar their competitors from meaningful access to adjudicatory tribunals and ... to usurp that decisionmaking process” by “instituting] the proceedings and actions ... with or without probable cause, and regardless of the merits of the cases.” Id. at 512, 92 S.Ct. 609 (internal quotation marks omitted). In other words, the allegations, if proven, showed that the “administrative and judicial processes have been abused.” Id. at 513, 92 S.Ct. 609.
*179 The Court returned to the exception in Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). There, after the respondents filed a single copyright suit against the petitioners, the petitioners responded with an antitrust action, dubbing the copyright suit a sham. The Supreme Court outlined a two-part definition of sham litigation. Id. at 60, 113 S.Ct. 1920. First, “the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.” Id. The existence of probable cause to institute the legal proceeding irrefutably demonstrates that the antitrust plaintiff has not proved the objective prong. Id. at 63, 113 S.Ct. 1920. If the antitrust plaintiff fails to satisfy the objective prong, the analysis ends and the defendant is immune from suit. Only if the underlying litigation is objectively meritless does the court address the second factor: the litigant’s subjective motivations. Id. at 60, 113 S.Ct. 1920. Under this second part of the test, the court asks whether “the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor ... through the use [of] the governmental process — as opposed to the outcome of that process — as an anticom-petitive weapon.” Id. at 60-61, 113 S.Ct. 1920 (citations and internal quotation marks omitted).
Following California Motor and Professional Real Estate, questions arise as to the relationship between these two cases. Hanover Realty argues that, because Defendants filed a series of petitions without regard to merit, its allegations are in line with those from California Motor. Defendants respond by pointing to the Supreme Court’s more recent two-step analysis in Professional Real Estate, arguing that we must find each petition objectively baseless before assessing Defendants’ subjective motivations.[13]
Three other Courts of Appeals have reconciled California Motor and Professional Real Estate by concluding that they apply to different situations: California Motor to a series of sham petitions and Professional Real Estate to a single sham petition.[14] See Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27, 728 F.3d 354, 363-364 (4th Cir.2013); Primetime 21 Joint Venture v. Nat’l Broad. Co., 219 F.3d 92, 101 (2d *180 Cir.2000); USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO, 31 F.3d 800, 810-11 (9th Cir.1994).
In the first case to tackle this issue, the Ninth Circuit explained that, in its view, the two-step inquiry in Professional Real Estate applies to the evaluation of a single suit or legal proceeding. USS-POSCO, 31 F.3d at 810-11. In such a case, the analysis is retrospective: if the alleged sham petition is not objectively baseless, defendants are immune — end of story. See id. at 811. California Motor, by contrast, is concerned with a defendant who brings a series of legal proceedings. The Supreme Court there “recognized'that the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action.” Id. Thus, when faced with a series or pattern of lawsuits, “the question is not whether any one of them has merit — some may turn out to, just as a matter of chance — but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.” Id. Unlike the inquiry from Professional Real Estate, this inquiry is prospective and asks whether the legal filings were made, “not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment.” Id.
We agree with the approach to California Motor and Professional Real Estate that has been adopted by the Second, Fourth, and Ninth Circuits. As stated in Noerr itself, the ultimate purpose of this inquiry is to determine whether the petitioning activity is a “mere sham to cover what, is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.” Noerr, 365 U.S. at 144, 81 S.Ct. 523. The best way to make that determination depends on whether there is a single filing or a series of filings. Where there is only one alleged sham petition, Professional Real Estate’s exacting two-step test properly places a heavy thumb on the' scale in favor of the defendant. With only one “data point,” it is difficult to determine with any precision whether the petition was anticompetitive. See FTC Report at 35. Thus, Professional Real Estate requires a showing of objective baselessness before looking into subjective motivations in order to prevent any undue chilling of First Amendment activity. In contrast, a more flexible standard is appropriate when dealing with a pattern of petitioning. Not only do pattern cases often involve more complex fact sets and a greater risk of antitrust harm, but the reviewing court sits in a much better position to assess whether a defendant has misused the governmental process to curtail competition. As a result, even if a small number of the petitions turn out to have some objective merit, that should not automatically immunize defendants from liability. See USS-POSCO, 31 F.3d at 811 (“[E]ven a broken clock is right twice a day.”).
Accordingly, when a party alleges a series of legal proceedings, we conclude that the sham litigation standard from California Motor should govern. This inquiry asks whether a series of petitions were filed with or without regard to merit and for the purpose of using the governmental process (as opposed to the outcome of that process) to harm a market rival and restrain trade. In deciding whether there was such a policy of filing petitions with or without regard to merit, a court should perform a holistic review that may include looking at the defendant’s filing success— i.e., win-loss percentage — as circumstantial evidence of the defendant’s subjective mo *181 tivations. Compare Waugh, 728 F.3d at 365 (finding sham where one of fourteen proceedings was successful), with USS-POSCO, 31 F.3d at 811 (finding no sham where fifteen of twenty-nine lawsuits were successful), and Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc., 552 F.3d 1033, 1046 (9th Cir.2009) (finding no sham where defendant “won seven of the seventeen suits” and each of the ten remaining cases “had a plausible argument on which it could have prevailed”). If more than an insignificant number of filings have objective merit, a defendant likely did not have a policy of filing “willy-nilly without regard to success.” See USS-POSCO, 31 F.3d at 811. A high percentage of meritless or objectively baseless proceedings, on the other hand, will tend to support a finding that the filings were not brought to redress any actual grievances. See City of Columbia v. Omni Outdoor Adver., 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (explaining that “the filing of frivolous objections ... simply in order to impose expense and delay” is the “classic example” of a sham). Courts should also consider other evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on plaintiffs by defendants’ petitioning activity (e.g., abuses of the discovery process and interference with access to governmental agencies). See Professional Real Estate, 508 U.S. at 68, 113 S.Ct. 1920 (Stevens, J., concurring).
Defendants argue as a threshold matter that the four actions they filed against Hanover Realty are too few to even qualify as a pattern or series. We are not convinced. In so concluding, we do not set a minimum number requirement for the applicability of California Motor or find that four sham petitions will always support the use of California Motor. It is sufficient for our purposes that four petitions were filed against Hanover Realty and it alleges that Defendants filed these sham proceedings at every opportunity to obstruct Hanover Realty from “obtaining all necessary government approvals.” App. 71.
Turning to Hanover Realty’s allegations, we conclude it can establish that Defendants had a policy of filing anticom-petitive sham petitions. Defendants’ challenge to the Flood Permit was objectively baseless. The Environmental Department issued Hanover Realty its permit and found that ShopRite had only a generalized property interest and its claim of greater competition did not demonstrate it was an aggrieved party. Courts have “consistently” rejected the types of arguments offered by Defendants, the Environmental Department explained. App. 157. In addition to the lack of objective merit, Hanover Realty alleges indicia of bad faith. For example, it alleges that, five months after they submitted a request for an adjudicatory hearing, Defendants filed an amended request with “new” proposed facts that were already known to Defendants at the time they submitted their initial request. The “only basis” for this filing, Hanover Realty alleges, was to slow down the review process. App. 76. Defendants’ alleged tactic suggests they were more interested in delay than in redressing any grievances.
Similarly, with respect to the action in lieu of prerogative writs, the New Jersey state court easily found that ShopRite was not an interested party because it failed to show how any of its rights would be affected by the approval of Hanover Realty’s site plan. The court dismissed the complaint. We agree that Defendants’ arguments for why they had standing are objectively baseless. .Hanover Realty also alleges that Defendants filed three amended complaints only for the purpose of delay. This allegation indicates that Defendants’ complaint was not brought out of a *182 genuine desire to obtain relief, but rather to keep the suit pending as long as possible.
Defendants claim two victorious moments with respect to the Wetlands Permit. They first point to the fact that they successfully identified a technical deficiency in the application, and that the Environmental Department required Hanover Realty to correct this administrative error. We liken this to hitting a single in the second inning. Hanover Realty submitted a new application within days and the problem was resolved. See Waugh, 728 F.3d at 365 (“[T]he fact that there may be moments of merit within a series of lawsuits is not inconsistent with a campaign of sham litigation.”). Defendants also remind us that the Environmental Department required Hanover Realty to conduct a survey for the presence of Indiana bats, as it had requested. But this also does not qualify as success. The ostensible goal of Defendants’ challenge was for the Environmental Department to deny the Wetlands Permit. They were unsuccessful on that front; Hanover Realty received the permit. Hanover Realty also alleges subjective evidence of abusing the governmental process. Defendants allegedly complained to the United States Fish and Wildlife Service even though they knew the wetlands at issue are not federally regulated waters. Moreover, in an email, Defendants’ ecological consultant touted its ability to delay the permit approval process.
Defendants arguably fared slightly better in connection with their challenge to the Street Permit. They submitted objections to the Department of Transportation arguing, among other things, that Hanover Realty was required to build an overpass over a highway before beginning construction. In its letter responding to the parties, the Department of Transportation did acknowledge that it was required to consider any data or arguments submitted by third parties. Defendants extract success from that statement, but we do not. That the Department of Transportation was required to consider Defendants’ challenge does not mean that their arguments had any bite. Where Defendants did have some success, however, was in the Department of Transportation’s finding that the prior developer’s agreement triggered the need for additional highway improvements. But, rather than requiring Hanover Realty to make those improvements, the letter recognized that such construction might not be feasible or worthwhile. It therefore recommended that Hanover Realty negotiate a modification to the agreement with the Department of Transportation before proceeding any further. This action was a partial success because Defendants’ challenge did have some merit, but it did not cause the Department of Transportation to actually reject the permit application.
All in all, the allegations and the record show that Hanover Realty received the Flood and Wetlands Permits, it got the state-court action dismissed, and it avoided having to make significant highway improvements. Defendants’ meager record on the merits supports Hanover Realty’s allegation that that the filings were not brought to redress any grievances. Nor have Defendants articulated any genuine interest in flooding or traffic near the proposed Wegmans (which is two miles away from the ShopRite), or in protecting the Indiana bat. Rather, Hanover Realty sufficiently alleges that Defendants brought these actions under a policy of harassment with the effect of obstructing Hanover Realty’s access to governmental bodies. The filings have imposed significant expense on Hanover Realty, have continued to delay the project, and threaten the viability of the project altogether. That Defendants have had some insignificant success along the way does not alter the analysis when *183 reviewing a pattern or series of proceedings. Accordingly, Hanover Realty can establish that the sham exception to Noerr-Pennington immunity applies because it sufficiently alleges that Defendants “instituted the proceedings and actions ... with or without probable cause, and regardless of the merits of the eases.” Cal. Motor, 404 U.S. at 516, 92 S.Ct. 609.[15]
C. Remaining Arguments
Defendants contend that Hanover Realty has failed to allege facts showing that there is a “dangerous probability of [Defendants] achieving monopoly power.” W. Penn Allegheny, 627 F.3d at 108. In support of this position, Defendants argue that Hanover Realty has not adequately alleged a product or geographic market.[16]
According to Defendants, Hanover Realty has not properly defined the alleged product market for full-service supermarkets because it has not distinguished full-service supermarkets from any other supermarkets or grocery stores. Defendants believe this supposed sub-market is a contrivance. We disagree. “Competing products are in the same market if they are readily substitutable for one another; a market’s outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by the cross-elasticity of demand.” Broadcom, 501 F.3d at 307 (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Moreover, “in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.” Queen City Pizza, Inc. v. Domino’s Pizza, Inc., 124 F.3d 430, 436 (3d Cir.1997). We cannot say, at this very early stage in the litigation, that Hanover Realty’s product market is implausible. Hanover Realty alleges that full-service supermarkets are distinct from other grocery suppliers because they provide customers with additional amenities, including prepared foods to go, on-site dining options, wine and liquor, specialty products, and other services such as pharmacies, banks, and fitness centers. Hanover Realty further alleges that consumers have come to enjoy full-service supermarkets as a one-stop shopping experience that allows them to avoid driving to different stores to check off the items on their grocery lists. Because consumers plausibly treat full-service supermarkets as a distinct submarket, the allegations here support the position that the market for full-service supermarkets “encompass[es] all interchangeable substitute products.” Id. Through discovery, Hanover Realty may be able to demonstrate that a price increase at the ShopRite would not cause consumers to shop at other more traditional grocery stores.
Defendants also argue that the proposed geographic market&emdash;greater Morristown&emdash;is too imprecise. In Defendants’ view, Hanover Realty has not alleged facts suggesting that ShopRite could raise prices without causing consumers to drive elsewhere. Again, we disagree. “[T]he relevant geographic market is the *184 area in which a potential buyer may rationally look for the goods or services he or she seeks.” Eichorn v. AT & T Corp., 248 F.3d 131, 147 (3d Cir.2001) (internal quotation marks omitted). Hanover Realty alleges that, when it comes to buying groceries, consumers like to shop near their homes. Thus, it alleges, proximity to a large upscale population is an important factor in determining where to locate a full-service supermarket. We find it plausible that greater Morristown, which includes Morristown and its neighboring communities, is a distinct geographic market. If the ShopRite in Morristown raised its prices, it is plausible that only the most diligent and frugal customer would move his or her grocery shopping to a more distant supermarket.[17]
III. CONCLUSION
For the foregoing reasons, we will affirm in part, vacate in part, and remand to the District Court for further proceedings consistent with this opinion.

. For the reasons set forth in Part III of Judge Ambro's partial concurrence, I agree with Judge Ambro's decision to use an “issue voting" approach to determine the outcome of the judgment in this case.

. Unless otherwise indicated, the facts are taken from the amended complaint, documents relied upon in that complaint, and matters of public record. See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir.2014).

. Indiana bats may be found over a broad swath of the United States, including New Jersey. But true to name, half of this bat population does, in fact, hibernate in Indiana. See Indiana Bat Fact Sheet, U.S. Fish & Wildlife Service, http://www.fws.gov/midwest/ endangered/mammals/inba/inbafctsht.htrnl (last visited Aug. 13, 2015).

. In its appellate brief, Hanover Realty informs us that it conducted the Indiana bat survey and no bats were found.

. In a supplemental letter filed with the Court, Hanover Realty says that, in June 2015, the Environmental Department denied Defendants’ request for a hearing.

. Hanover Realty informs us in a letter that, after renegotiating the developer’s agreement and otherwise revising its proposal, the Department of Transportation issued the Street Permit in April 2015.

. The District Court also dismissed the parts of Counts One and Two that assert a conspiracy to violate the Sherman Act because Hanover Realty failed to allege the particulars of this conspiracy. As Hanover Realty does not challenge this finding on appeal, we affirm the dismissal of Counts One and Two to the extent they contain conspiracy claims.

. The District Court had jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction to review the District Court's final order under 28 U.S.C. § 1291. We review de novo a district court's grant of a motion to dismiss and construe all facts in the light most favorable to the nonmoving party. See Rea v. Federated Investors, 627 F.3d 937, 940 (3d Cir.2010).

. We pause to note that at least one of our cases discussing antitrust injury contains language that is potentially overstated. In Barton & Pittinos, without mentioning the “inextricably intertwined” doctrine, we found no antitrust injury because the plaintiff was "not a competitor or a consumer in the market in which trade was allegedly restrained.” 118 F.3d at 184. We later cast doubt on that statement, clarifying that the conclusion in Barton, "if construed as an absolute (which arguably it need not be), may in some circumstances lead to results that conflict with Supreme Court and other precedent.” Carpet Grp. Int’l v. Oriental Rug Importers Ass’n, Inc., 227 F.3d 62, 76 (3d Cir.2000), overruled on other grounds, Animal Science Prods., Inc. v. China Minmetals Corp., 654 F.3d 462 (3d *175 Cir.2011). We, of course, agree with Carpet Group and our other cases that have allowed for the possibility of antitrust injury based on a showing of harm that is inextricably intertwined with the defendant’s wrongdoing, rather than harm just to competitors or consumers.

. See, e.g., Serfecz v. Jewel Food Stores, 67 F.3d 591 (7th Cir.1995); Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079 (6th Cir.1983); Acme Mkts., Inc. v. Wharton Hardware & Supply Corp., 890 F.Supp. 1230 (D.N.J.1995); Rosenberg v. Cleary, Gottlieb, Steen & Hamilton, 598 F.Supp. 642 (S.D.N.Y.1984).

. Defendants also urge us to follow Rosenberg, a decades-old district court decision from outside this circuit. Although Rosenberg involved similar facts to those here — competitor supermarkets filing a series of lawsuits to enjoin the construction of a new supermarket — the court’s legal analysis is not persuasive. See 598 F.Supp. at 643-44. The court mechanically applied Southaven without even mentioning the possibility of antitrust injury based on the "inextricably intertwined” exception. Id. at 645.

. Although the District Court did not discuss Noerr-Pennington, we will address this issue in the first instance because it raises questions of law over which we exercise plenary review and has been fully briefed by the parties. See Hudson United Bank v. LiTenda Mortg. Corp., 142 F.3d 151, 159 (3d Cir.1998). The same goes for Defendants’ other arguments for dismissal, which we discuss further below. .

. Defendants maintain that Hanover Realty waived its argument regarding applying the California Motor analysis because it never raised this issue before the District Court and it did not raise the issue on appeal until its supplemental reply brief. See Gardiner v. VI. Water & Power Auth., 145 F.3d 635, 646-47 (3d Cir.1998). Defendants argue that, before the District Court, Hanover Realty agreed it had to satisfy the test from Professional Real Estate. We disagree that Hanover Realty has waived this argument. Throughout this litigation Defendants have consistently argued for Noerr-Pennington immunity and Hanover Realty has consistently responded that the sham exception applies. Hanover Realty’s failure to cite particular cases within its broader argument for the sham exception does not amount to a waiver. Moreover, by alleging an “illegal scheme” through a “series of sham litigations,” Hanover Realty put Defendants on notice of the relevant facts supporting its theory under California Motor. App. 63. Finally, Defendants have not been prejudiced by this argument because we exercise plenary review over this issue and they have filed a supplemental brief responding to Hanover Realty's position.

. A staff report from the Federal Trade Commission also agrees with this view. See Federal Trade Commission, Enforcement Perspectives on the Noerr-Pennington Doctrine, at 28-38 (2006) ("FTC Report”), available at https://www.ftc.gov/sites/default/files/ documents/advocacy_documents/ftc-staff-report-concerning-enforcement-perspective snoerr-pennington-doctrine/pO 13518enf perspectnoerr-penningtondoctrine.pdf.

. Defendants also argue that, because some of the proceedings are ongoing, Hanover Realty’s suit is premature. We reject this argument because the California Motor analysis is prospective, not retrospective. See USS-POS-CO, 31 F.3d at 810-11. If we were to agree with Defendants on this point, they could keep filing petitions and avoid judicial review indefinitely.

. Because we already found that Hanover Realty does not have antitrust standing for its claim of attempted monopolization of the full-service supermarket shopping center market (Count Two), we address here only the claim relating to full-service supermarkets (Count One).

. We have considered and rejected Defendants’ remaining arguments. They argue there is no dangerous probability of achieving a monopoly because there is another full-service supermarket in the area — the Stop & Shop of Morris Plains. Defendants maintain that Hanover Realty has admitted this fact. But in making that argument, Defendants rely on Hanover Realty’s initial complaint, not its amended complaint, which is operative. In the amended complaint, Hanover Realty alleges that the Stop & Shop is a “grocery store,” App. 72, and that ShopRite is the “only full-service supermarket” in Greater Morristown, App. 73. We must accept those allegations as true. Defendants’ final argument is that Hanover Realty has failed to allege a specific intent to monopolize. For the reasons discussed above in connection with the Noerr-Pennington doctrine, we conclude Hanover Realty sufficiently alleges that Defendants filed a series of sham proceedings with the intent to interfere with a prospective competitor and restrain trade.