14-3574(L)

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: March 21, 2016    Decided: August 9, 2016)

Docket Nos. 14-3574(L); 14-3581(CON)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before:    JACOBS and HALL, <u>Circuit Judges</u>, and RESTANI, <u>Judge</u>.*

Purchasers of semi-fabricated and fabricated aluminum allege a conspiracy

to manipulate the price of aluminum.  In a nutshell, the claim is that some

aluminum futures traders, having acquired some operators of aluminum

warehouses, manipulated a price component for aluminum in the Detroit metro

---

* The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

area.  The United States District Court for the Southern District of New York

(Forrest, J.) dismissed the complaints in this multidistrict litigation and denied

two groups of plaintiffs leave to amend, while permitting a third group of

plaintiffs to amend their complaint.  The district court concluded that appellants

lacked antitrust standing because they did not demonstrate that they suffered

antitrust injury or that they were efficient enforcers of the antitrust laws, and that

they would be unable to show that they were efficient enforcers through

repleading.  The district court also determined that appellants failed to state a

claim under various state consumer protection and unfair trade practices laws.

We hold that appellants lack antitrust standing on the ground that they did

not (and could not) suffer antitrust injury.  We also hold that their myriad state

law claims were inadequately pleaded.  Accordingly, we affirm the district court's

dismissal of appellants' complaints and denial of leave to amend.

Affirmed.

> KIMBERLY A. JUSTICE (Joseph H. Meltzer,
> Terence S. Ziegler, Scott M. Lempert, John
> Q. Kerrigan, on the brief), Kessler Topaz
> Metlzer & Check, LLP, Radnor, PA;

2

Jonathan W. Cuneo, Joel Davidow, Yifei "Evelyn" Li, Cuneo Gilbert & LaDuca, LLP, Washington, DC; Daniel C. Girard, Amanda M. Steiner, Adam E. Polk, Girard Gibbs LLP, San Francisco, CA, for Plaintiffs-Appellants Commercial End Users.

DOUGLAS G. THOMPSON (Michael G. McLellan, on the brief), Finkelstein Thompson LLP, Washington, DC; Brian R. Strange, Keith L. Butler, Strange & Butler, Los Angeles, CA, for Plaintiffs-Appellants Consumer End Users.

RICHARD C. PEPPERMAN II (Suhana S. Han, William H. Wagener, Yavar Bathaee, on the brief), Sullivan & Cromwell LLP, New York, NY; John M. Nannes, John H. Lyons, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC; Robert D. Wick, David Haller, Henry Liu, John Playforth, Covington & Burling LLP, Washington, DC; Eliot Lauer, Jacques Semmelman, Chelsea McLean, Curtis, Mallet-Prevost, Colt, & Mosle LLP, New York, NY, for Defendants-Appellees.

DENNIS JACOBS, Circuit Judge:

Purchasers of semi-fabricated and fabricated aluminum allege a conspiracy to manipulate the price of aluminum. In a nutshell, the claim is that some

aluminum futures traders, having acquired some operators of aluminum warehouses, manipulated a price component for aluminum in the Detroit metro area.  The United States District Court for the Southern District of New York (Forrest, J.) dismissed the complaints in this multidistrict litigation and denied two groups of plaintiffs – the Commercial End Users ("Commercials") and Consumer End Users ("Consumers") – leave to amend, while permitting a third group of plaintiffs – the First Level Purchasers ("Purchasers") – to amend their complaint.  The district court concluded that Commercials and Consumers lacked antitrust standing because they did not demonstrate that they suffered antitrust injury or that they were efficient enforcers of the antitrust laws, and that they would be unable to show that they were efficient enforcers through repleading. The district court also determined that they failed to state a claim under various state consumer protection and unfair trade practices laws.

We hold that Consumers and Commercials lack antitrust standing on the ground that they did not (and could not) suffer antitrust injury.  We also hold that their myriad state law claims were inadequately pleaded.  Accordingly, we affirm

4

the district court's dismissal of Consumers' and Commercials' complaints and denial of leave to amend.

## BACKGROUND

The mechanics of the aluminum futures, warehousing, and distribution markets are exceedingly complex. Detailed information on how the relevant markets operate is set out in the district court order that is the basis of this appeal by Consumers and Commercials, In re Aluminum Warehousing Antitrust Litigation ("Aluminum I"), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014), and the district court order addressing Purchasers' amended complaint, In re Aluminum Warehousing Antitrust Litigation ("Aluminum II"), 95 F. Supp. 3d 419 (S.D.N.Y. 2015). This section of the opinion lays out only the facts needed to explain our analysis and result.

In general, there are two types of warehouses that stockpile aluminum: those that are affiliated with the London Metal Exchange ("LME") and those that are not. Warehouses that are not affiliated with the LME typically store aluminum for users of physical aluminum, e.g., producers, fabricators, and

5

manufacturers, and are located near those users of physical aluminum. LME-warehouses typically store aluminum for derivatives traders and are located all over the world.

Derivatives traders demand LME-warehouses because only aluminum stored in an LME-warehouse can be used to satisfy an LME futures contract for aluminum. Such traders are rarely interested in exchanging physical aluminum at the conclusion of a futures trade; rather, the buyer and seller will almost always enter into offsetting trades, leaving the aluminum underlying the derivatives trade unmoved. When derivatives traders do settle a futures contract by exchanging physical aluminum, they do so by having the seller deliver to the buyer a "warrant" issued by an LME warehouse. An LME warrant is a right to obtain a particular lot of aluminum at a particular LME warehouse. LME rules permit a seller to choose to deliver any warrant that it owns to satisfy a futures trade because all aluminum in LME-warehouses is identical, i.e., of a standardized amount and grade. That means the seller can deliver to a buyer who is located in South Carolina a warrant for aluminum that is stored in South

6

Korea. For this reason, users of physical aluminum much prefer to purchase aluminum from non-LME warehouses that are geographically proximate to them.

The price for physical aluminum is set by a formula comprised of two inputs. Each input is calculated daily and is based on the supply and demand dynamics for aluminum stored in one of the two types of warehouses. The first input is the LME Cash Price, which is the global cash spot price of aluminum purchased on the LME. The LME Cash Price approximates the price of a standardized amount of a standardized grade of aluminum available for delivery to an abstract location. Because aluminum in LME warehouses is rarely delivered, the LME Cash Price does not reflect the cost of delivery. The second input is based on a survey of the prevailing spot price of aluminum for delivery that various buyers and sellers of physical aluminum in one geographic locale report to the trade publication Platts. Because the Platts survey price is based on the price being paid for actual delivery of physical aluminum, it includes the cost of delivery.

The mathematical difference between the Platts survey price and LME Cash Price is the regional premium. In theory, the regional premium should reflect the cost of delivering (and financing and insuring) the local, immediately available aluminum in a given region. Most contracts for the purchase of aluminum incorporate the LME Cash Price, the regional premium, and any additional cost related to the conversion of raw aluminum into aluminum products.

The plaintiffs' core allegation is that from 2009 to 2012, the defendants conspired to manipulate the regional premium in the Detroit metro area (the "Midwest Premium") so that it no longer accurately reflected the cost of delivering, financing, and insuring local, immediately available aluminum in the Midwest. The plaintiffs are three types of purchasers of semi-fabricated and fabricated aluminum: Purchasers, which purchased aluminum directly from aluminum producers; Commercials, which purchased semi-fabricated aluminum to manufacture products made of aluminum; and Consumers, which purchased finished products made of aluminum. The primary defendants are three traders

8

and their LME-warehouse operator affiliates.[1]  Each trader defendant purchased its warehouse affiliate in 2010; a subsidiary of each trader defendant was a partial owner of the LME throughout the class period of 2009 to 2012.

During the global financial crisis, a sharp drop in demand for aluminum in the United States led to large surpluses at depressed prices.  Some of this excess aluminum was purchased by traders betting that it would be profitable to buy the commodity, pay to finance and store it in LME-warehouses, and then sell it via a futures contract.  This arbitrage opportunity, called a "contango" in derivatives parlance, increased demand for services of LME-warehouses.  LME-warehouses make money by charging rent while the aluminum is stored, and exit penalties when the aluminum leaves; therefore, they have an incentive to store the greatest quantity for as long as possible.

The plaintiffs allege that as the traders bought their affiliate warehouse operators, the defendants conspired to increase artificially the cost of storing

---

[1]     The pairs are: The Goldman Sachs Group Inc. (the trader) and Metro International Trade Services LLC (the warehouse operator); JPMorgan Chase & Co. (the trader) and Henry Bath LLC (the warehouse operator); and Glencore Ltd. (the trader) and Pacorini Metals USA LLC (the warehouse operator).

aluminum in LME-warehouses by creating long "queues" to take aluminum out of LME-warehouses. The inflated costs for storing aluminum at LME-warehouses, they allege, directly increased the Midwest Premium, which the plaintiffs claim they eventually paid downstream.

Long queues developed from the interplay between actions taken by the trader defendants and warehouse operator defendants. To take physical possession of aluminum stored in an LME-warehouse, the warrant holder, i.e., the owner of the lot, "cancels" the warrant, which triggers an obligation by the LME-warehouse to load out the aluminum for pick up from its loading docks. The plaintiffs allege that the wholesale cancelling of warrants by the trader defendants created backlogs of physical aluminum at their affiliate warehouses; and that some traders directed the warehouses to reissue warrants to a neighboring warehouse for the aluminum that just got loaded-out, which led to a "shuttling" of aluminum from one warehouse to another. This exacerbated the wait time because it diverted warehouse resources toward picking up aluminum instead of loading it out.

The warehouse operator defendants also allegedly contributed to the lengthening queues. For several years before the traders bought the warehouse operators, LME-warehouse operators were required to load out a minimum amount of aluminum each day. But this LME rule did not net out load-ins, so if a warehouse took in more aluminum than the daily minimum load-out amount, the inventory at the warehouse would grow. Moreover, the rule was applied on a city-wide basis, so that a warehouse operator with multiple warehouses in a single city could comply with the rule by loading out from just one warehouse.

The plaintiffs allege that once the traders purchased the warehouse operators, the defendants manipulated the implementation of the minimum load-out rule to slow down the load out of aluminum. The core allegation is that one warehouse operator defendant with multiple LME-warehouses in the Detroit metro area allegedly began treating the minimum load-out rule as a de facto daily load-out limit. This was done by exploiting the lack of a net out requirement and city-wide application of the load-out rule. The warehouse operator also allegedly hired fewer employees to work fewer hours and offered incentive payments to

11

aluminum traders and producers to keep aluminum at its warehouses.

This slow loading out of aluminum, combined with the trader defendants' widespread warrant cancellation, allegedly lengthened delivery queues at LME-warehouses. The plaintiffs allege that the lengthening delivery queues increased storage costs at LME-warehouses, which are reflected in the Midwest Premium; the resulting inflated Midwest Premium was in turn a component of the price that the Purchasers paid for aluminum; and Purchasers then passed that inflated cost to downstream purchasers of aluminum like Commercials, and eventually, Consumers.

The plaintiffs do not allege that they ever stored aluminum with the warehouse operator defendants, engaged in futures trades with any of the trader defendants, or purchased aluminum that was ever present in any of the defendants' warehouses.

Consumers, Commercials, and Purchasers sued the defendants under, <u>inter alia</u>, Section 1 of the Sherman Act, several state antitrust laws, and scores of state consumer protection and unfair trade statutes. The district court dismissed all

claims brought by all three groups of plaintiffs. As relevant here, the district court determined that the plaintiffs had failed to: (i) demonstrate they had antitrust standing, (ii) allege a plausible antitrust conspiracy, and (iii) state a claim under any of the state statutes. Moreover, the district court determined that it would be futile to permit Consumers and Commercials to amend their complaints because they would be unable to plead around their lack of antitrust standing given that "[t]here will always be others who are more directly injured than them, as well as others who will be more efficient enforcers of federal antitrust laws." Aluminum I, 2014 WL 4277510, at *39. The district court similarly denied Consumers and Commercials leave to replead the various state consumer protection and unfair trade practices claims because their alleged injuries were too remote. In re Aluminum Warehousing Antitrust Litigation, 2014 WL 4743425, at *3 n.5 (S.D.N.Y. Sept. 15, 2014). (On the other hand, the district court concluded that Purchasers might be able to remedy their pleading deficiencies.) Consumers and Commercials appeal from this order, over which we have appellate jurisdiction. See Gelboim v. Bank of Am. Corp., 135 S. Ct. 897, 904 (2015).

13

Several months later, the district court denied the defendants' motions to dismiss the Purchasers' amended complaint. In that order, which is not the subject of this appeal, the district court concluded that the Purchasers, while not participants in any of the defendants' markets, had demonstrated they had antitrust standing because their purchases of aluminum are "inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out." Aluminum II, 95 F. Supp. 3d at 442. The district court also concluded that the Purchasers would be efficient enforcers of the antitrust laws and that the Purchasers had plausibly alleged an antitrust conspiracy.

## DISCUSSION

We review de novo the grant of a motion to dismiss, accept as true all factual claims in the complaint, and draw all reasonable inferences in the plaintiffs' favor. Fink v. Time Warner Cable, 714 F.3d 739, 740-41 (2d Cir. 2013). Similarly, we review de novo denial of leave to amend when it was based on an interpretation of law, e.g., futility. Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012).

14

An antitrust plaintiff must show both constitutional standing and antitrust standing at the pleading stage. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC"), 459 U.S. 519, 535 n.31 (1983). "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 75 (2d Cir. 2013) (citation omitted). The limitation of antitrust standing to "a proper party" arose because "[a]ntitrust law has long recognized that defendants who may have violated a provision of the antitrust statutes are not liable to every person who can persuade a jury that he suffered a loss in some manner 'that might conceivably be traced' to the conduct of the defendants." Reading Indus., Inc. v. Kennecott Copper Corp., 631 F.2d 10, 12 (2d Cir. 1980) (citation omitted).

To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations. See Gatt Commc'ns, 711 F.3d at 76. In order to establish antitrust injury, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Even a plaintiff that has suffered an antitrust injury must also demonstrate that it is a suitable plaintiff, i.e., an "efficient enforcer" of the antitrust laws. Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 438 (2d Cir. 2005).

Typically, we have applied the efficient enforcer inquiry to a plaintiff asserting a federal antitrust claim for damages. See, e.g., Gelboim v. Bank of Am. Corp., 823 F.3d 759, 778 (2d Cir. 2016); Gatt Commc'ns, 711 F.3d at 78-80; Daniel, 428 F.3d at 443-44. Commercials and Consumers, however, do not bring claims for damages under federal law; their federal claims are carefully limited to injunctive relief, while their claims for money are raised under various state laws.

16

We need not resolve the parties' vigorous dispute over which, if any, of the efficient enforcer factors apply in this case because we conclude that Commercials and Consumers fail to satisfy the first requirement of antitrust standing: that they suffered an antitrust injury.

**A**

Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury. See Hughes v. Tobacco Inst., Inc., 278 F.3d 417, 423 (5th Cir. 2001) ("Parties whose injuries . . . are experienced in another market do not suffer antitrust injury."); Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained."). "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." Serpa Corp. v. McWane, Inc., 199 F.3d 6, 10 (1st Cir. 1999); see also Am. Ad Mgmt., Inc., 190 F.3d at 1057 ("[C]onsumers and competitors are most likely to suffer antitrust injury[.]"); SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 45 (1st Cir. 1995)

("[C]ompetitors and consumers are favored plaintiffs in antitrust cases[.]");

Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1086 (6th Cir. 1983)

("The pleading probatively concedes that [plaintiff] is neither a consumer,

competitor or participant in [the relevant] market."). Courts have also

"recognize[d] the antitrust claims of market participants other than consumers or

competitors," e.g., potential new market entrants, suppliers, and dealers. Am. Ad

Mgmt., Inc., 190 F.3d at 1057 & n.6 (citing cases).

The universe of potential plaintiffs is not strictly limited to participants in

the defendants' market. Consumers and Commercials rely on the fact that in Blue

Shield of Virginia v. McCready, 457 U.S. 465 (1982), the Supreme Court "carved a

narrow exception to the market participant requirement for parties whose injuries

are 'inextricably intertwined' with the injuries of market participants." Am. Ad

Mgmt., Inc., 190 F.3d at 1057 n.5; see also Southaven Land Co., 715 F.2d at 1086

("[A] finding or concession that [plaintiff] is not a direct participant in the

relevant market is not dispositive of the [antitrust] standing issue [because]

McCready instructs that an injury 'inextricably intertwined' with the injury

18

sought to be inflicted upon the relevant market or participants therein may . . . [suffice].") But McCready does not support Consumers' and Commercials' claim of antitrust injury, and neither do subsequent cases of this Circuit, or other circuits, or, indeed, later cases from the Supreme Court.

The plaintiff in McCready sought insurance coverage for her psychotherapy treatment by a psychologist under a health insurance plan that provided reimbursement for psychotherapy only if provided by a psychiatrist. Her antitrust action against the health insurance provider and a group of psychiatrists alleged collusion to exclude psychologists from receiving compensation under the health insurance plan, to the detriment of psychologists and their patients. Although she was a participant in the market for receiving treatment from a psychologist, she was not a participant in the market for treatment from a psychiatrist or the market for group health insurance.

The Supreme Court concluded that she had plausibly alleged antitrust injury. The Supreme Court explained that it had previously recognized "two types of limitation on the availability of the [antitrust] remedy." McCready, 457

U.S. at 473. The first limitation developed in order to avoid the "duplicative recovery" that might occur were courts to allow "every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." Id. at 474-75. The claim in McCready presented no such risk because the plaintiff had already paid her psychologist. The second limitation developed to preclude those with injuries "too remote" from, and not proximately caused by, the antitrust violation from bringing antitrust claims. The McCready claim likewise did not pose a remoteness problem because her injury was "clearly foreseeable." Id. at 479. In fact, her injury was "a necessary step in effecting the ends of the alleged illegal conspiracy" and "the very means by which it is alleged that [the health insurance provider] sought to achieve its illegal ends." Id.

True, the health insurance provider did not ultimately intend to injure the plaintiff. But the health insurance provider and group of psychiatrists accomplished their purported goal of harming the psychologists by inflicting direct harm on health insurance subscribers (like the plaintiff) who wanted to consult psychologists. Therefore, though she was not a competitor or customer of

20

the conspirators, "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." Id. at 484. To explain its reasoning, the Supreme Court offered the hypothetical of "a group of psychiatrists conspir[ing] to boycott a bank until the bank ceased making loans to psychologists." Id. at 484 n.21. Just as "the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions," the health plan subscriber should as well. Id.

The following year, in AGC, the Supreme Court characterized McCready this way: the plaintiff "alleged that she was a consumer of psychotherapeutic services and that she had been injured by the defendants' conspiracy to restrain competition in the market for such services." AGC, 459 U.S. at 538. AGC also emphasized that, unlike the plaintiff in AGC, the McCready plaintiff "was directly harmed by the defendants' unlawful conduct." Id. at 529 n.19. That is, the McCready plaintiff was a participant in the market that was the target of the alleged scheme and in which she directly suffered harm.

Shortly after McCready, we decided a case in which an organizer of a trade

show asserted a claim against pay-television networks that were alleged to have orchestrated a boycott of the trade show in order to prevent their suppliers and competitors (television producers and other television networks) from meeting with one another. Crimpers Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290 (2d Cir. 1983) (Friendly, J.). The plaintiff's injury, like the injury in McCready, "was the precisely intended consequence of defendants' boycott" and "could hardly have been more 'direct.'" Id. at 294, 296. And just as the health insurance plan's refusal to honor the McCready plaintiff's claim for psychotherapeutic services "was a means to defendants' objective" to harm psychologists, the ruin of the trade show was the defendants' "means to eliminate competition." Id. at 292. This was sufficient to recognize the trade-show organizer's antitrust injury.

Our sister circuits are in accord. The Third Circuit described the McCready plaintiff as being "directly targeted for harm by parties ultimately wishing to inflict a derivative harm on a competitor." Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc., 806 F.3d 162, 172 (3d Cir. 2015). To satisfy McCready in the Sixth Circuit, the plaintiff "must have been 'manipulated or utilized by

[d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market.'" Province v. Cleveland Press Publ'g Co., 787 F.2d 1047, 1052 (6th Cir. 1986) (quoting Southaven Land Co., 715 F.2d at 1086). In other words, the plaintiff must be directly harmed by the defendants' manipulative scheme in a certain market, and the injury that results must be one that operates as "a fulcrum, conduit or market force," i.e., "means" to inflict injury on participants in the defendants' market. Finally, the First Circuit has also focused on the nature of the plaintiff's injury in McCready, reading the case "as [one] in which the plaintiff was a purchaser in the very market directly distorted by the antitrust violation" instead of some grand departure from established antitrust injury doctrine. SAS of P.R., 48 F.3d at 46.[2]

We agree with the First Circuit that the thrust of McCready is that the

_____

[2] Indeed, the First Circuit is "doubtful that ['inextricably intertwined'] – if taken as physical image – was ever intended as a legal test of standing." SAS of P.R., 48 F.3d at 46. Not only would it be difficult to apply, but "such a test would certainly be very hard to square with the longstanding limitations on claims by stockholders, employees and even indirect purchasers" and "[n]othing in McCready suggests that it intended to overrule those limitations." Id. Moreover, the Supreme Court in AGC and Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) – two cases concerning the scope of antitrust standing – "simply reinterpreted the ['inextricably intertwined'] phrase as a legal conclusion." Id.

23

plaintiff was a participant in "the very market directly distorted by the antitrust violation." Id. The year after it issued McCready, the Supreme Court likewise emphasized that the plaintiff in McCready had "alleged that she was a consumer of psychotherapeutic services and that she had been injured by the defendants' conspiracy to restrain competition in the market for such services." AGC, 459 U.S. at 538. In Crimpers, we similarly concentrated on the fact that the trade-show organizer's injury "was the precisely intended consequence of defendants' boycott" and "could hardly have been more 'direct.'" Crimpers, 724 F.2d at 294, 296. The McCready and Crimpers plaintiffs were participants in the market that was the immediate target of the alleged scheme, and that is where they directly suffered harm at the hands of the defendants.

McCready detailed the plaintiff's injury as being "a necessary step" in effecting the conspiracy, and "the very means" by which the conspirators accomplished their objective, to explain *why* the health insurance provider and psychiatrists would care to harm a health insurance plan subscriber who patronized a psychologist. McCready, 457 U.S. at 479. The Supreme Court

recognized that defendants may decide that they can best achieve their anticompetitive ends by corrupting a market other than their own. Consequently, most of the time when a putative plaintiff has suffered antitrust injury that is "inextricably intertwined" with the injury the conspirators ultimately intended to inflict, it is because the conspirators used the plaintiff's injury as the "means," "fulcrum," "conduit," or "market force" to realize their illegal ends. This observation does not erode the antitrust standing requirement that the putative plaintiff participate in the market that is directly manipulated by the collusive conduct. Rather, this observation supplies the *reason* defendants would bother to corrupt some market in which they do not participate.

Therefore, to assess the plausibility of a putative plaintiff's claim to antitrust injury as being "inextricably intertwined" with the injury the defendants ultimately sought to inflict, courts ask whether the plaintiff was "manipulated or utilized by [defendant] as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets." Southaven Land Co., 715 F.2d at 1086; see also Crimpers, 724 F.2d at 292 (asking whether the

25

plaintiff's injury was "a means to defendants' objective"); IIA Areeda &

Hovenkamp, <u>Antitrust Law</u> ¶ 339, at 145 (4th ed. 2014) (concluding that

<u>McCready</u> "clearly limited" the meaning of the "inextricably intertwined"

exception "to those whose injuries are the essential means by which defendants'

illegal conduct brings about its ultimate injury to the marketplace").

The Third Circuit's recent decision in <u>Hanover 3201 Realty</u> illustrates this

well. The plaintiff was a real estate developer that agreed to build a supermarket

in a small town. The defendant was a competing supermarket chain that already

had a location in the same town. The plaintiff alleged that the defendant filed

numerous, baseless challenges to the plaintiff's development permit applications

to frustrate the entry of a competitor. The Third Circuit concluded that the real

estate developer had antitrust standing under the "inextricably intertwined"

exception. The incumbent supermarket corrupted the market for property

development permits. The direct and intended effect of the incumbent

supermarket's anticompetitive conduct was to force the real estate developer to

spend time and money fending off obstructionist permit challenges. As a result,

the incumbent supermarket hoped that the real estate developer would be unable to build the location for its competitor, or that its competitor would give up and move on to another town. As in McCready, a participant in the precise market that was manipulated was directly harmed by conduct that was "the very means by which [d]efendants could get to [the incoming competitor]." Hanover 3201 Realty, 806 F.3d at 174. The real estate developer's injury was "necessary" and "essential" to the success of the incumbent supermarket's anticompetitive scheme, not merely "incidental" or a "byproduct." Id. at 173, 174.

The upshot is that to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained. Usually, that market is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant, but sometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be "inextricably intertwined" with the injury of the ultimate target. Regardless, antitrust injury is suffered by participants in the restrained market (or markets).

**B**

Consumers and Commercials disavow participation in any of the markets in which the defendants operate. They did not store aluminum in the defendants' warehouses; they did not trade aluminum futures contracts with the defendants; and they do not allege that any of the aluminum they purchased was ever stored in any of the defendants' warehouses, or was the underlying asset for any of the defendants' futures trades. They premise their claim to antitrust injury solely on their purchases of aluminum and aluminum products on the physical aluminum market, where prices were allegedly affected by the defendants' alleged anti-competitive behavior. Consumers and Commercials argue that they suffered an antitrust injury because, under McCready, their role in creating demand for physical aluminum makes them "inextricably intertwined" with the anti-competitive scheme.

Whatever injury Consumers and Commercials suffered, it was not "inextricably intertwined" with whatever injury the defendants allegedly intended to inflict. To fall within McCready, Consumers and Commercials had to

28

participate in the very market that the defendants directly restrained. They allege the following anticompetitive conduct: the trader defendants cancelled warrants en masse; the trader defendants directed the warehouse operators to shuttle aluminum from one warehouse to another; the warehouse operator defendants treated the minimum load-out requirement as a maximum; and the warehouse operator defendants offered incentive payments to attract more aluminum. All of this conduct took place (if at all) in the LME-warehouse storage market, and that is where the direct, immediate impact would have been felt. Consumers and Commercials do not and cannot allege that they participated in that market.

Nor were Consumers' and Commercials' injuries "a necessary step" in effectuating the alleged conspiracy to lengthen load-out queues or increase the Midwest Premium, or "the very means" by which the defendants did these things. All of the alleged anticompetitive acts – cancelling warrants, shuttling aluminum, and slowing load-outs – were within the defendants' power to do; they did not need or use injury to the Consumers or Commercials as a "fulcrum" or "conduit." And none of these acts inflicted direct injury on Consumers or

29

Commercials; the injury Consumers and Commercials claim was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme.

Commercials and Consumers in effect argue that the "inextricably intertwined" exception is a "but-for" cause test: if Commercials and Consumers did not exist, there would be no real world purchasers of aluminum, and without users of physical aluminum, there would be no market for aluminum futures or aluminum warehousing. This approach would limitlessly increase the universe of potential plaintiffs, and cannot be squared with McCready itself, which held that courts must apply a "proximate cause" test to alleged antitrust injury. McCready, 457 U.S. at 477-78. The "inextricably intertwined" exception still requires that the anticompetitive conduct proximately cause the antitrust injury.

Undaunted, Consumers and Commercials allege that the defendants also intended to corrupt the market for primary aluminum, and that the injuries Consumers and Commercials suffered by paying a higher Midwest Premium were "inextricably intertwined" with that scheme. This gets McCready

30

backwards. Even assuming a plausible allegation that the defendants conspired to corrupt the primary aluminum market, the purported injuries of Consumers and Commercials were not "the very means" by which the defendants achieved that illegal end; insofar as anyone's injury could be "the very means," it would be the injury suffered by participants in the market for LME-warehouse storage. If the trader and warehouse operator defendants sought to increase the price for primary aluminum, and they could not do so directly, one alternative means at their disposal would be manipulating the LME-warehouse storage market. That is, after all, how Commercials and Consumers allege the defendants increased the Midwest Premium, and thereby the price for primary aluminum. In such a scenario, injuring the participants in the LME-warehouse storage market by forcing them to pay higher storage costs might be deemed the "essential means" by which the defendants achieve their purported objective. Injury to Consumers and Commercials remains collateral damage.

In sum, not every collusive scheme will yield plaintiffs that can claim injury under McCready. Most of the time, conspirators effectuate an anticompetitive

31

outcome without reliance on some "fulcrum" or "conduit," and without need to corrupt some separate market. The defendants in McCready, Crimpers, and Hanover 3201 Realty are outliers; they could not achieve their illegal ends (harming psychologists, television producers and networks, and a newcomer supermarket) without injuring participants in some other market (a health insurance plan subscriber, a trade-show organizer, and a real estate developer). Unless the market dynamics force conspirators to corrupt a separate market to achieve their illegal ends, potential McCready plaintiffs do not arise.

For the foregoing reasons, whatever injuries Consumers and Commercials suffered were not "inextricably intertwined" with the defendants' alleged anticompetitive conduct. Consumers and Commercials therefore failed to allege (and could not allege) antitrust injury, a deficiency that is fatal to all of their federal and state antitrust-based claims.

## II

Commercials and Consumers purport to bring claims under myriad state consumer protection and unfair trade statutes arising out of the same

32

anticompetitive allegations underlying the antitrust claims. The complaint does little more than list a couple dozen state statutes in alphabetical order by state, without pleading any of their elements. The pleading baldly asserts that the defendants' violations of those statutes proximately caused their injuries.

Commercials' and Consumers' briefing fails to explain adequately how the defendants' conduct violated any of the state consumer protection and unfair trade statutes in the conclusory list. Commercials and Consumers also fail to demonstrate why any of these claims should survive if the antitrust claims are dismissed. Indeed, because each statute that the defendants allegedly violated requires that the violation proximately cause the claimed injury, and because Commercials' and Consumers' alleged injuries are too remote to sustain their antitrust claims, it would be futile to permit Commercials and Consumers to amend their complaints. Accordingly, Commercials' and Consumers' state law claims were appropriately dismissed and leave to amend appropriately denied.

## CONCLUSION

For the foregoing reasons, we affirm.

33