**MERCED IRRIGATION DISTRICT,**
**Plaintiff,**

v.

**BARCLAYS BANK PLC, Defendant.**

**15 Civ. 4878 (VM)**

United States District Court,
S.D. New York.

Signed 11/07/2016

Filed 11/10/2016

---

Jeffrey Alan Klafter, Michael Hayden Reed, Klafter, Olsen & Lesser, LLP, Rye Brook, NY, Pamela A. Markert, Solomon B. Cera, Gold Bennett Cera & Sidener, LLP, San Francisco, CA, Daniel J. Sponseller, Law Office of Daniel J. Sponseller, Sewickley, PA, Eric L. Christensen, Cairncross & Hempelmann, PS, Seattle, WA, for Plaintiff.

Shepard Goldfein, Boris Bershteyn, Peter S. Julian, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendant.

### DECISION AND ORDER

VICTOR MARRERO, United States District Judge.

Plaintiff Merced Irrigation District ("Merced") brought this putative class action alleging that defendant Barclays Bank PLC ("Barclays") unlawfully manipulated daily index prices for electricity in violation of Sections 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. Sections 1, 2 ("Section 1" and "Section 2"), and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Section 17200. Merced also alleges claims of unjust enrichment. ("Complaint," Dkt. No. 1.)

By Decision and Order dated February 29, 2016, this Court granted Barclays's motion to dismiss Merced's claims under Section 1 and Merced's claims for unjust enrichment but denied Barclays's motion to dismiss Merced's claims under Section 2 and the UCL. See Merced Irrigation Dist. v. Barclays Bank PLC, 165 F.Supp.3d 122 (S.D.N.Y. 2016) ("February 29 Order"), reconsideration denied, 178 F.Supp.3d 181 (S.D.N.Y. 2016).

By letter dated October 24, 2016 ("October 24 Letter," Dkt. No. 36), Barclays seeks a pre-motion conference to move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"), arguing that two recent decisions by the Court of Appeals

for the Second Circuit decided after the February 29 Order—In re Aluminum Warehousing Antitrust Litigation ("Aluminum III"), 833 F.3d 151 (2d Cir. 2016) and Gelboim v. Bank of America Corp., 823 F.3d 759 (2d Cir. 2016)—mandate dismissal of Merced's claims because Merced does not have antitrust standing. Construing the October 24 Letter as a motion for judgment on the pleadings ("Motion") and for the reasons stated below, Barclays's motion is DENIED in its entirety.

## I. FACTUAL BACKGROUND[1]

Barclays contends that Aluminum III, 833 F.3d 151 (2d Cir. 2016), in which the Second Circuit held that purchasers of aluminum had not alleged antitrust injury where defendants had conspired to manipulate the market for aluminum warehousing services, mandates dismissal of Merced's claims. Barclays further contends that Gelboim, 823 F.3d 759 (2d Cir. 2016), also warrants dismissal of this action. There, the Second Circuit in dicta expressed doubt about whether plaintiffs, who had lost money on a transaction where the price referenced a financial benchmark allegedly manipulated by defendants, were "efficient enforcers" of antitrust laws, and remanded for further consideration. Barclays argues that Gelboim mandates dismissal here for the same reasons.

By letter dated October 28, 2016 ("October 28 Letter," Dkt. No. 39), Merced opposes Barclays's Motion, arguing that unlike defendants' conduct in Aluminum III, Barclays's anticompetitive conduct here was intended to distort the market for electricity in which Merced traded. Merced further argues that unlike the concern expressed by the Second Circuit in Gelboim—unlimited antitrust liability out of proportion to the wrongdoing—there is no danger that Barclays's damages in this action would be disproportionate to its misconduct, which took place over several years and which Barclays knew governed prices for a variety of contracts.

By letter dated October 31, 2016 ("October 31 Letter," Dkt. No. 40), Barclays requested leave to file a reply, which the Court granted. Barclays argues that, although Merced's October 28 Letter alleges that there was one market for electricity, Merced's complaint alleges that Barclays monopolized the market for contracts that set the daily index prices, while Merced traded only in contracts for which the price was determined by those same index prices. Barclays argues that Merced's Complaint therefore fails to allege that it traded in the same market as that allegedly manipulated by Barclays. Barclays further argues that Merced ignores the similarity between the plaintiffs in Gelboim and Merced for purposes of determining whether Merced is an "efficient enforcer."

## II. LEGAL STANDARD

### A. 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS

" The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). The role of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evi-

---

1. The Court incorporates the factual background described in the February–29 Order. See Merced, 165 F.Supp.3d at 128–31 (S.D.N.Y. 2016). The Court accepts the facts in the Complaint as true for the purposes of this motion. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

dence which might be offered in support thereof." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 113 (2d Cir. 2010) (internal quotation marks omitted). A complaint should be dismissed if the plaintiff has not offered sufficient factual allegations that render the claim facially plausible. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The complaint should not be dismissed if the factual allegations "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The pleadings must include more than "a formulaic recitation of the elements of a cause of action," Twombly, 550 U.S. at 555, 127 S.Ct. 1955; it must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

## III. DISCUSSION

### A. ANTITRUST STANDING

Section 4 of the Clayton Act provides a private right of action for antitrust violations to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. Section 15. The United States Supreme Court and the Second Circuit have interpreted this language to require that the plaintiff establish not only constitutional standing but also antitrust standing. See, e.g., Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110–11 & n.5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); Assoc. Gen. Contractors of Calif., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 534–35 & n.31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); Aluminum III, 833 F.3d at 157.

To establish antitrust standing pursuant to the Clayton Act, a plaintiff must show (1) that it suffered an antitrust injury and (2) that it is a proper plaintiff in light of four "efficient enforcer" factors. In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009). "To establish antitrust injury, the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Aluminum III, 833 F.3d at 157 (quoting Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). The four efficient enforcer factors are:

(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

Gatt Commc'ns, Inc. v. PMC Associates, L.L.C., 711 F.3d 68, 78 (2d Cir. 2013).

### A. IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION

Barclays first contends that the Second Circuit's recent decision in Aluminum III mandates dismissal here. Plaintiffs in that case, three classes of purchasers of aluminum, alleged that defendants' anticompetitive behavior in the aluminum warehouse services market led to higher prices for aluminum, causing the plaintiffs to incur increased costs. Aluminum III, 833 F.3d at 151. After the District Court dismissed with prejudice the claims of the two classes of "downstream purchasers," those plaintiffs appealed. On appeal, the Second Circuit affirmed, holding that although the purchasers had suffered injury in the form of higher aluminum prices, because the defendants had conspired to manipulate

the market for aluminum storage services, which was separate from the market for physical aluminum in which plaintiffs were active, plaintiffs' damages were collateral, and as such did not qualify as an antitrust injury. See Aluminum III, 833 F.3d at 163. The Second Circuit held that although a plaintiff who is not the ultimate target of the anticompetitive behavior can suffer antitrust injury, that normally occurs when the wrongdoer manipulates the market in which the plaintiff is active but ultimately intends to ultimately affect a second, related market, making plaintiff's injury the conduit or means to realize the conspirators' unlawful ends. Id. at 160–61. But to suffer antitrust injury, the Second Circuit held, the plaintiffs need to be purchasers in the actual market manipulated by the defendants' anticompetitive conduct, which plaintiffs in Aluminum III were not.

After Aluminum III was decided, the defendants moved to dismiss the claims of the remaining class of plaintiffs, who were the immediate, or "upstream," purchasers of aluminum, on the basis that the Second Circuit's decision required the same result for the remaining class. See In re Aluminum Warehousing Antitrust Litig. ("Aluminum IV"), No. 13–MD–2481, 2016 WL 5818585, at *2 (N.Y.S.D. Oct. 5, 2016). The District Court held that the reasoning in Aluminum III applied equally to the remaining class of plaintiffs, who were also purchasers of physical aluminum, but had no dealings in the warehouse services market that the defendants were alleged to have manipulated. See id. at *7–8.

■ Barclays's contention that Merced's claims should be dismissed based on the Second Circuit's and the District Court's recent decisions in Aluminum III and Aluminum IV reads those decisions too broadly. Barclays contends that under Aluminum III Merced did not suffer antitrust injury because it did not participate in the "ICE day-ahead fixed price physical contract market" in which Barclays operated. (Dkt. No. 36 at 1.) But Merced alleges that Barclays "unreasonably restrained the markets for trading electricity and electricity-related contracts which set the daily index prices" in that it "intentionally acquired and maintained monopoly power over the Daily Index Prices at the [relevant electricity hubs], and over the prices for the sale of electricity under pre-existing contracts that settled against such Daily Index Prices and the prices payable under financial contracts that settled against such Daily Index Prices." (Dkt. No. 1, at 2, 5 (emphasis added).) That Merced entered into contracts for electricity that were structured differently than those entered by Barclays does not preclude antitrust standing. Whereas the Aluminum defendants manipulated the market for warehouse services, which affected the market for aluminum, Barclays allegedly manipulated the market for electricity, which is exactly the market in which Merced traded, and what Merced purchased. Aluminum III and Aluminum IV therefore do not mandate dismissal of Merced's case.

## B. GELBOIM v. BANK OF AMERICA CORP.

■ Barclays also contends that another recent case decided by the Second Circuit, Gelboim v. Bank of America Corp., 823 F.3d 759 (2d Cir. 2016), mandates dismissal of Merced's action because Merced is not an efficient enforcer of the antitrust laws against Barclays. (See Dkt. No. 36 at 3.) This Court already held that "[e]ach of the four 'efficient enforcer' factors favors granting standing to Merced." Merced, 165 F.Supp.3d at 134. The Gelboim Court's discussion does not warrant a different conclusion at this stage.

Plaintiffs in Gelboim were purchasers of financial instruments that carried a rate of return indexed to the London Interbank Offered Rate ("LIBOR"), which defendant banks had allegedly colluded to manipulate. See Gelboim, 823 F.3d at 767. The banks moved to dismiss the complaints of four groups of plaintiffs: (1) purchasers of interest rate swaps—transactions of which the rate of return was tied to LIBOR—who acquired the swaps directly from the defendant banks; (2) bondholders who alleged that the banks' anticompetitive actions reduced the rate of return on their bonds; (3) other plaintiffs whose allegations were similar to the first and second groups but who were not included in those classes; and (4) traders of contracts based on U.S. dollars deposited in commercial banks abroad, the settlement price of which was calculated based on LIBOR. See id. at 767–68.

After finding that the plaintiffs had suffered antitrust injury, the Circuit Court expressed doubt whether they were efficient enforcers of the antitrust laws. Concluding that the four efficient enforcer factors "reflect a concern about whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement," the Second Circuit remanded the issue to the District Court for further consideration. Id. at 780 (internal quotation marks omitted). This Court will now discuss the four efficient enforcer factors in light of the reasoning in Gelboim.

First, the Gelboim Court noted concern and a split in the circuits as to whether "those plaintiffs who did not deal directly with the [defendants]" had antitrust standing when the defendants controlled only part of the relevant market, as was the case in Gelboim. Id. at 778. The Gelboim Court further found that "requiring the

Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would ... vastly extend the potential scope of antitrust liability in myriad markets where derivatives have proliferated." Id. at 779.

Merced similarly "did not deal directly" with Barclays, but instead "ended up on the wrong side of an independent" contract the terms of which referenced the indexes allegedly manipulated by Barclays. Id. at 778–79. It is unclear how many entities are parties to contracts that reference the indexes at issue here, but if Barclays were to be held responsible for all of them, it would greatly expand Barclay's potential liability. Nonetheless, this factor is unlikely to have as much weight as it did in Gelboim, where innumerable financial instruments all over the world relied upon LIBOR to determine rates of return, because the scope of Merced's action is limited to contracts which settled against the indexes "at four Western United States based trading hubs." (Dkt. No. 1 at 5.)

Second, as to whether there are more direct victims, the Gelboim Court found that because "remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers ... directness may have diminished weight." Id. Merced similarly suffered the same injury as the counterparties to the contracts which Barclays actually entered, so the second factor is of limited importance.

Third, the Gelboim Court found that the fact that the rates in the relevant contracts were negotiated (although with reference to LIBOR), the global market for money, and the wide variety of products that reference LIBOR, would "present[ ] some unusual challenges" in determining damages. Id. at 780. Here, although damages would

be difficult to determine with accuracy, the difficulty would be less than it was in Gelboim, where the potential plaintiffs would have been difficult to ascertain and where the global market for money would likely have presented an infinite variety of financial instruments that in some way reference LIBOR. See Gelboim, 823 F.3d at 780.

Fourth, the Gelboim Court found that it was unclear, given the ongoing government and regulatory investigations and suits in several countries, which were investigating "countless" transactions, how issues of duplicate recovery and damage apportionment could be assessed. Id. Here, although the results of the ongoing investigation by the Federal Energy Regulatory Commission are pending and could potentially lead to duplicate recoveries or difficult apportionment of damages, this is not a case in which "[t]he transactions that are the subject of investigation and suit are countless" and in which "[r]elated proceedings are ongoing in at least several countries." Id.

The preceding analysis makes clear that the facts of this case favor Merced as a plaintiff more than the facts in Gelboim favored the plaintiffs there. Gelboim therefore does not warrant reversal of this Court's conclusion that "Merced is a proper plaintiff to bring suit against Barclays for federal antitrust violations." Merced, 165 F.Supp.3d at 134.

Accordingly, the Court concludes that neither Aluminum III nor Gelboim requires dismissal of Merced's remaining claims. Merced has sufficiently alleged that Barclays manipulated the price of electricity and electricity-related contracts to increase its own profits and that Merced suffered injury as a result of Barclays's actions. Although there may be other potential plaintiffs whose injuries may be more direct because they interacted directly with Barclays, that does not preclude Merced from having standing to enforce the antitrust laws in this case.[2]

## IV. ORDER

For the reasons stated above, it is hereby

2. As Merced's October 28 Letter (Dkt. No. 39) points out, recent decisions in this district that post-date both Aluminum III and Gelboim support a finding that Merced has antitrust standing in this case. In In re Foreign Exchange Benchmark Rates Antitrust Litigation, for instance, Judge Schofield held that plaintiffs who transacted in foreign exchange futures and futures options that were traded on exchanges had antitrust standing even where they had not transacted directly with defendants. See No. 13 CIV. 7789, 2016 WL 5108131, at *9–11 (S.D.N.Y. Sept. 20, 2016). In two recent decisions regarding manipulation of gold and silver prices, Judge Caproni held that plaintiffs' allegations that defendants in that case had manipulated the benchmark price of gold and silver to benefit their own trading, causing plaintiffs to receive a lower rate of return on their instruments, were "sufficient to demonstrate that Plaintiffs' injuries are 'inextricably intertwined' with the Defendants' alleged manipulation of the Fix Price for antitrust standing purposes to the extent that Defendants relied on Plaintiffs' and other market participants' trading on a manipulated [benchmark price] in order to carry out their alleged scheme." In re London Silver Fixing, Ltd., Antitrust Litig., 213 F.Supp.3d 530, 552, No. 14–MD–2573, 2016 WL 5794777, at *9 (S.D.N.Y. Oct. 3, 2016); In re Commodity Exch., Inc., 213 F.Supp.3d 631, 653, No. 14–MD–2548, 2016 WL 5794776, at *11 (S.D.N.Y. Oct. 3, 2016). Judge Caproni further held that although the plaintiffs who had traded exchange traded funds ("ETFs") did not have standing because their claims were duplicative of the injuries suffered by the ETF funds themselves, the remaining "Plaintiffs have plausibly alleged that they are efficient enforcers for purposes of antitrust standing." In re London Silver Fixing, Ltd., Antitrust Litig., 213 F.Supp.3d 530, 557, 2016 WL 5794777, at *13 (S.D.N.Y. Oct. 3, 2016); In re Commodity Exch., Inc., 213 F.Supp.3d 631, 658–59, 2016 WL 5794776, at *14–15 (S.D.N.Y. Oct. 3, 2016).

**ORDERED** that the motion for judgment on the pleadings (Dkt. No. 36) filed by defendant Barclays Bank PLC to dismiss the Complaint (Dkt. No. 1) of plaintiff Merced Irrigation District, is **DENIED. SO ORDERED.**